11 MAG 2617

Approved: _____
GLEN A. KOPP/EDWARD Y. KIM
Assistant United States Attorneys

ORIGINAL

Before: HONORABLE MICHAEL H. DOLINGER
United States Magistrate Judge
Southern District of New York

DOC # ___1___

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - v. -

MANSSOR ARBABSIAR,
  a/k/a "Mansour Arbabsiar," and
GHOLAM SHAKURI,
  a/k/a "Ali Gholam Shakuri,"

     Defendants.

- - - - - - - - - - - - - - - - - X

**SEALED AMENDED COMPLAINT**

Violations of

18 U.S.C. §§ 1117,
1958, 2, 2332a, 2332b

COUNTY OF OFFENSE:
NEW YORK

U.S. DISTRICT COURT
FILED
OCT 1 1 2011
S. D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

     O. Robert Woloszyn, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
**Conspiracy to Murder A Foreign Official**

     1.    From at least in or about the spring of 2011, up to and including in or about October 2011, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendants, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to violate Section 1116 of Title 18, United States Code.

     2.    It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendants, and others known and unknown, would and did agree to kill a foreign official, to wit, ARBABSIAR and SHAKURI agreed with each other and with others to kill the Ambassador to the United States of Saudi Arabia, while the Ambassador was in the United States.

**Overt Acts**

     3.    In furtherance of the conspiracy and to effect the

illegal object thereof, the following overt acts were committed, in the Southern District of New York and elsewhere:

        a.   On or about August 1, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, caused an overseas wire transfer of approximately $49,960 to be sent by a foreign entity from a bank located in a foreign country to an FBI undercover bank account (the "UC Bank Account").  Before reaching the UC Bank Account, the funds were transferred through a bank in Manhattan, New York.

        b.   On or about August 9, 2011, ARBABSIAR caused an overseas wire transfer of approximately $49,960 to be sent by a foreign entity from a bank located in a foreign country to the UC Bank Account.  Before reaching the UC Bank Account, the funds were transferred through a bank in Manhattan, New York.

        c.   In or about the spring of 2011, GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, provided thousands of dollars to ARBABSIAR in Iran to pay for expenses related to furthering the plot to kill the Ambassador to the United States of Saudi Arabia.

(Title 18, United States Code, Section 1117.)

## COUNT TWO
### Foreign Travel and Use of Interstate and Foreign Commerce Facilities in the Commission of Murder-For-Hire

    4.   From at least in or about the spring of 2011, up to and including September 29, 2011, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, willfully and knowingly traveled in foreign commerce and used, and caused another to use, a facility of interstate and foreign commerce, to wit, bank wire transfers to an account in the United States from foreign entities, with the intent that a murder be committed in violation of the laws of the United States, to wit, Title 18, United States Code, Sections 1116 and 1117, as consideration for the receipt of, and as consideration for a promise and agreement to pay anything of pecuniary value, as those terms are defined in Title 18, United States Code, Section 1958(b), to wit, ARBABSIAR caused to be wired approximately $100,000 into the United States, as partial consideration for the murder of the Ambassador to the United States of Saudi Arabia.

(Title 18, United States Code, Sections 1958 and 2.)

**COUNT THREE**
**Conspiracy to Engage in Foreign Travel**
**and Use Interstate and Foreign Commerce Facilities**
**In the Commission of Murder-For-Hire**

5.    From at least in or about the spring of 2011, up to and including in or about October 2011, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Section 1958.

6.    It was a part and an object of the conspiracy that MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendants, and others known and unknown, would and did agree together and with each other to use travel in foreign commerce and the facilities of interstate and foreign commerce, to wit, bank wire transfers to an account in the United States from foreign entities, with the intent that a murder be committed in violation of the laws of the United States, to wit, Title 18, United States Code, Sections 1116 and 1117, as consideration for the receipt of, and as consideration for a promise and agreement to pay anything of pecuniary value, to wit, ARBABSIAR, SHAKURI, and others known and unknown, caused to be wired approximately $100,000 into the United States as partial consideration for the murder of the Ambassador to the United States of Saudi Arabia.

**Overt Acts**

7.    In furtherance of the conspiracy and to effect the illegal objects thereof, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendants, and others known and unknown, committed in the Southern District of New York and elsewhere, the acts set forth in Paragraph 3 above.

(Title 18, United States Code, Section 1958.)

**COUNT FOUR**
**Conspiracy To Use A Weapon of Mass Destruction**

8.    From at least in or about the spring of 2011, up to and including in or about October 2011, in the Southern District of New York and elsewhere, MANSSOR ARBABSIAR, a/k/a

-3-

"Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam
Shakuri," the defendants, and others known and unknown, willfully
and knowingly combined, conspired, confederated and agreed
together and with each other to violate Title 18, United States
Code, Section 2332a(a)(2)(A) and (C).

          9.   It was a part and an object of the conspiracy that
MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI,
a/k/a "Ali Gholam Shakuri," the defendants, and others known and
unknown, would use a weapon of mass destruction, namely, a
destructive device as that term is defined in Title 18, United
States Code, Section 921, against a person within the United
States, where a facility of interstate and foreign commerce was
used in furtherance of the offense, to wit, bank wire transfers
to an account in the United States from foreign entities, and
where a perpetrator of the offense traveled in foreign commerce
in furtherance of the offense, to wit, ARBABSIAR and SHAKURI
agreed with each other and with others to use an explosive device
against the Ambassador to the United States of Saudi Arabia.

<u>Overt Acts</u>

          10.   In furtherance of the conspiracy and to effect the
illegal objects thereof, MANSSOR ARBABSIAR, a/k/a "Mansour
Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the
defendants, and others known and unknown, committed in the
Southern District of New York and elsewhere, the acts set forth
in Paragraph 3 above.

(Title 18, United States Code, Section 2332a(a)(2)(A) and (C).)

**COUNT FIVE**
**Conspiracy to Commit An Act of Terrorism**
<u>Transcending National Boundaries</u>

          11.   From at least in or about the spring of 2011, up
to and including in or about October 2011, in the Southern
District of New York and elsewhere, MANSSOR ARBABSIAR, a/k/a
"Mansour Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam
Shakuri," the defendants, and others known and unknown, willfully
and knowingly combined, conspired, confederated and agreed
together and with each other to violate Title 18, United States
Code, Sections 2332b(a)(1)(A), (a)(1)(B), (b)(1)(A) and
(b)(1)(B).

          12.   It was a part and an object of the conspiracy that
MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," and GHOLAM SHAKURI,
a/k/a "Ali Gholam Shakuri," the defendants, and others known and

unknown, would kill and maim persons within the United States and
would create a substantial risk of serious bodily injury to
others by destroying and damaging structures, conveyances and
other real and personal property within the United States, in
violation of the laws of the United States, including Title 18,
United States Code, Sections 1116 and 1117, where interstate and
foreign commerce is used in furtherance of the offense, to wit,
bank wire transfers to an account in the United States from
foreign entities, and where the offense would have obstructed,
delayed and affected interstate commerce had it been consummated,
to wit, ARBABSIAR and SHAKURI, during meetings outside the United
States, agreed with each other and with others to kill the
Ambassador to the United States of Saudi Arabia, while the
Ambassador was in the United States.

**Overt Acts**

13.   In furtherance of the conspiracy and to effect the
illegal objects thereof, MANSSOR ARBABSIAR, a/k/a "Mansour
Arbabsiar," and GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the
defendants, and others known and unknown, committed in the
Southern District of New York and elsewhere, the acts set forth
in Paragraph 3 above.

(Title 18, United States Code, Section 2332b(a)(1)(A), (a)(1)(B),
            (a)(2), (b)(1)(A), (b)(1)(B).)

The bases for my knowledge and the foregoing charges
are, in part, as follows:

14.   I have been a Special Agent with the FBI since
March of 1999.  I have participated in the investigation of this
matter, and have spoken with other individuals, including other
law-enforcement officials, about this investigation.  The facts
and circumstances of this investigation have been summarized for
the specific purposes of the instant affidavit.  No attempt has
been made to set forth the complete factual history of this
investigation or all of its details.

15.   I make this affidavit based on, among other
things, my personal review of evidence obtained in the course of
the investigation, as well as information and belief.  The
sources of my information and belief include, but are not limited
to, conversations with other law-enforcement officers; reviews of
reports and other documents prepared by law-enforcement
personnel; reviews of business records; draft transcripts and
translations of recordings, as well as the underlying recordings
themselves; and the defendant's post-arrest statements.  Where
the actions, statements and conversations of others, or the

-5-

contents of documents, are recounted or described herein, they are related in substance and in part, unless otherwise indicated.

## I.   OVERVIEW

16.   As set forth more fully below, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, is a naturalized citizen of the United States who holds both a United States and an Iranian passport.   ARBABSIAR and his Iran-based co-conspirators, including GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, a member of the Qods Force, see infra ¶ 17, have been plotting the murder of the Ambassador to the United States of Saudi Arabia ("Ambassador").   In furtherance of this conspiracy, ARBABSIAR has met on a number of occasions in Mexico with a Drug Enforcement Administration confidential source ("CS-1").   In the course of these meetings, CS-1 has posed as an associate of a sophisticated and violent international drug-trafficking cartel.   See infra n.2.   ARBABSIAR arranged to hire CS-1 and his purported criminal associates to murder the Ambassador, and SHAKURI and other Iran-based co-conspirators were aware of and approved the plan.   With SHAKURI's approval, ARBABSIAR caused approximately $100,000 to be wired into a bank account in the United States for CS-1 — as a down-payment to CS-1 for his anticipated killing of the Ambassador.

## II.   BACKGROUND: THE IRANIAN ISLAMIC REVOLUTIONARY GUARD CORPS AND THE QODS FORCE

17.   During the course of my investigation, I have become familiar with the Iranian Islamic Revolutionary Guard Corps (the "IRGC") and the Qods Force.   Based in part on my review of publicly-available information, including findings and statements by the United States Department of State, the United States Department of Treasury, and other "open source" information, I have learned the following: the IRGC is an arm of the Iranian military; the IRGC is suspected of having been involved in a number of foreign operations; the IRGC is composed of a number of branches, one of which is the Qods Force.   The Qods Force conducts sensitive covert operations abroad, including terrorist attacks, assassinations, and kidnappings, and provides weapons and training to Iran's terrorist and militant allies. Among many other things, the Qods Force is believed to sponsor attacks against Coalition Forces in Iraq, and in October 2007, the United States Treasury Department designated the Qods Force, pursuant to Executive Order 13224, for providing material support to the Taliban and other terrorist organizations.

## III.  THE INVESTIGATION

### A.   MAY 2011:
### ARBABSIAR MEETS CS-1 AND DISCUSSES WITH HIM THE POSSIBILITY OF AN ATTACK

18.   On or about May 24, 2011, according to travel records, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, traveled back and forth from Texas to Mexico.  In Mexico, ARBABSIAR met with CS-1.[1]  During this May 24 meeting, and all others with ARBABSIAR, CS-1 posed as an associate of a drug-trafficking cartel ("Drug Cartel #1").[2]  After the May 24 meeting with ARBABSIAR, CS-1 described to law-enforcement agents what had transpired.  CS-1 explained that, at the meeting, ARBABSIAR inquired as to CS-1's knowledge, if any, with respect to explosives.  According to CS-1, ARBABSIAR explained to CS-1 that he was interested in, among other things, attacking an embassy of Saudi Arabia.  In response, and to further the discussion, CS-1 told ARBABSIAR that he was knowledgeable with respect to C-4 explosives.[3]

19.   On or about May 30, 2011, according to travel records, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, traveled internationally, by plane from Houston, Texas.

_____

[1]  CS-1 is a paid confidential source.  Previously, CS-1 was charged in connection with a narcotics offense by authorities of a certain U.S. state ("State").  In exchange for CS-1's cooperation in various narcotics investigations, the State charges were dismissed.  CS-1 has previously provided reliable and independently corroborated information to federal law-enforcement agents; this information has led to numerous seizures of narcotics.  In addition, CS-1 has been paid by federal law-enforcement officials in connection with the work he has done.

[2]  Drug Cartel #1 is a large, sophisticated, and violent drug-trafficking cartel.  It is well-known throughout North America, and its principal places of operation are Mexico and the United States.  According to published reports, Drug Cartel #1 has access to military-grade weaponry and explosives, and has engaged in numerous acts of violence, including assassinations and murders.

[3]  "C-4" is a type of plastic explosive.  Like other plastic explosives, C-4 can generally be molded, so that it can be shaped and formed with a certain degree of precision.

B.   **JUNE AND JULY 2011:**
      **ARBABSIAR RETURNS TO MEXICO AND HIRES CS-1 TO KILL**
      **THE UNITED STATES-BASED AMBASSADOR OF SAUDI ARABIA**

20.   On or about June 23, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, who had traveled internationally, <u>see</u> <u>supra</u> ¶ 19, returned by plane to Mexico.

21.   According to CS-1, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, again met with CS-1 in Mexico in late June and July.   Over the course of a series of meetings, ARBABSIAR explained to CS-1 that his associates in Iran had discussed a number of violent missions for CS-1 and CS-1's purported criminal associates to perform.   These included, among others, the murder of the Ambassador.

22.   On or about July 14, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, met with CS-1 in Mexico.   At the direction of law-enforcement agents, CS-1 made an audio recording of the meeting.   CS-1 and ARBABSIAR spoke English during the meeting.   Based on my review of draft transcripts of the July 14 recorded meeting, I learned that at this meeting the following occurred, among other things:[4]

a.   CS-1 told ARBABSIAR that CS-1 would need to use "[a]t least four guys" and that CS-1 was "talking to one of the guys" and would "take the one point five for the Saudi Arabia."   I understand this to mean that CS-1 would need to use four men to assassinate the Ambassador and that the cost to ARBABSIAR of conducting the assassination would be $1.5 million.[5] CS-1 told ARBABSIAR that he would "go ahead and work on Saudi Arabia, get all the information that we can"; ARBABSIAR agreed that the assassination of the Ambassador should be handled first.[6]   After CS-1 stated, "you just want the, the main guy,"

--------

[4]   In his post-arrest statement, <u>see</u> <u>infra</u> Part IV, ARBABSIAR has admitted that he participated in each of the recorded meetings described in this Complaint, and he has confirmed that he agreed to pay CS-1 to kill the Ambassador.

[5]   Both above, and throughout, the quoted language is taken from the draft transcripts.   My understanding of the meaning of those quoted terms, where supplied, is based on my training, experience and participation in this investigation.

[6]   Prior to the July 14, 2011 meeting, CS-1 had reported that he and ARBABSIAR had discussed the possibility of attacks on

ARBABSIAR confirmed that he just wanted the "[A]mbassador" —
which I understand to mean that ARBABSIAR wanted CS-1 to arrange
for the assassination of the Ambassador before executing the
other attacks they had discussed.

      b.   CS-1 and ARBABSIAR then discussed how
ARBABSIAR would pay CS-1.  ARBABSIAR asked CS-1 what bank he
planned to use, and CS-1 stated that he would give ARBABSIAR "an
account number."  At a later time during the same conversation,
ARBABSIAR stated that the "money is [in] Iran," and that he
(ARBABSIAR) had received a call indicating that the money would
be at the house of a certain individual ("Individual #1").  When
ARBABSIAR called Individual #1, "he [Individual #1] said he had
it there" and that he (Individual #1) had received "the money at
nine in the morning."  ARBABSIAR said the "money's a hundred
thousand" but that he (ARBABSIAR) would have to "send a hundred .
. . ten thousand, ten thousand, ten thousand.  I don't wanna send
it to one guy, one shot."  I understand ARBABSIAR to mean that he
had $100,000 in Iran to pay CS-1 as a first payment toward the
assassination of the Ambassador, but that ARBABSIAR wanted to
send the money to CS-1 in installments and not in a single
transfer.

      c.   During their July 14 meeting, CS-1 asked
ARBABSIAR about ARBABSIAR's cousin, who, according to ARBABSIAR,
was located in Iran and had requested that ARBABSIAR find someone
(ultimately, CS-1) who could carry out the attack on the
Ambassador described above.  ARBABSIAR explained that his cousin
was "wanted in America," had been "on the CNN," and was a "big
general in [the] army."  ARBABSIAR further explained that there
were a number of parts to the army of Iran and that his cousin
"work[s] in outside, in other countries for the Iranian
government[.]"  ARBABSIAR further explained that his cousin did
not wear a uniform or carry a gun, and had taken certain
unspecified actions related to a bombing in Iraq.  Compare supra
¶ 17.  In the portions of the July 14 meeting referenced in this
sub-paragraph, I understand ARBABSIAR to be saying that his
cousin works for the military of Iran, in particular, for the
Qods Force, and that his cousin focuses on matters outside of
Iran.

      d.   At the end of the July 14 meeting, CS-1 told
ARBABSIAR, "[w]e're gonna start doing the guy," which I

---

a number of other targets.  These targets included foreign
government facilities associated with Saudi Arabia and with
another country, and these targets were located within and
outside of the United States.

understand to mean that CS-1 and ARBABSIAR confirmed that CS-1 would proceed to plan the assassination of the Ambassador.

        23.   On or about July 17, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, met with CS-1 — again, see supra ¶ 22, in Mexico.  At the direction of law-enforcement agents, CS-1 recorded the meeting.  CS-1 and ARBABSIAR spoke English during the meeting.  Based on my review of draft transcripts of the July 17 meeting, I learned that at this meeting the following occurred, among other things:

        a.   CS-1 made reference to "my guy over there . . . he's already in Washington," which I understand to be a reference to the fact that one of CS-1's workers had purportedly already traveled to Washington, D.C. to surveil the Ambassador. CS-1 then asked, "I got this on the computer . . . is this the guy right here?" — to which ARBABSIAR replied, "Yeah, that's him."  Based, among other things, on my discussions with other agents, I understand that during this portion of the conversation, CS-1 showed ARBABSIAR a photograph of the Ambassador.

        b.   CS-1 described what he had purportedly begun to learn about the Ambassador, stating that the Ambassador has "eight to seven security people around him . . . [h]e goes out and eat like two times a week in a restaurant . . . [m]y guy is already over there . . . doing surveillance."  CS-1 then reflected, "I don't know what exactly your cousin [see supra ¶ 22(c)[7]] wants me to do. . . ."  After some further conversation, ARBABSIAR replied: "[h]e wants you to kill this guy."  CS-1 then explained, "there's gonna be like American people there . . . in the restaurant.  You want me to do it outside or in the restaurant?"  ARBABSIAR answered: "[d]oesn't matter how you do it.  I mean, if you do it by himself, kill is better, but . . . sometime, you know, you have no choice, is that right?"  I understand ARBABSIAR and CS-1 to have been discussing how the Ambassador should be killed, and ARBABSIAR to be saying that his cousin wanted the Ambassador killed; without bystander casualties if possible ("by himself, kill is better") but not if operational necessities dictated otherwise ("sometime, you know, you have no

_____

        [7]  During the course of the July 17 conversation, ARBABSIAR further described his cousin.  ARBABSIAR said that his cousin was "working for [the] government [of Iran] but he's working outside. . . . He's working like . . .[l]ike [a named, non-Iranian intelligence agency]."

-10-

choice").[8]

       c.   On a number of occasions, ARBABSIAR re-
assured CS-1 that CS-1 and his (CS-1's) men would indeed be paid
for killing the Ambassador.  ARBABSIAR told CS-1 to tell the
people working for him (CS-1) that he (ARBABSIAR) could
"guarantee the money. . . I [ARBABSIAR] got the money coming."
ARBABSIAR emphasized that "this is politics, ok . . . it's not
like, eh, personal . . . This is politics, so these people
[ARBABSIAR's co-conspirators in Iran] they pay this
government . . . he's got [ARBABSIAR's cousin has got] the, got
the government behind him . . . . he's not paying from his
pocket."  To facilitate payment, at one point during the July 17
meeting, CS-1 gave ARBABSIAR "the account number . . . in [a U.S.
bank] . . . and the U.S. routing number" — the unique number
associated with the United States bank account into which
ARBABSIAR could arrange for payment to be made to CS-1 for the
assassination of the Ambassador.

       d.   ARBABSIAR explained that his cousin and an
individual who worked for his cousin had paid his (ARBABSIAR's)
expenses related to the assassination plot.  ARBABSIAR stated, "I
tell him [ARBABSIAR's cousin], give me just another fifteen.
Just . . . next morning they send one guy, you know, that work
for him [ARBABSIAR's cousin].  He's like a colonel, the guy."
CS-1 asked, "Did the colonel take the money, the money to you?"
ARBABSIAR responded, "Yes, man.  He opened the door for me, the
colonel, he bring the envelope.  He put the envelope there for
me."  Based on my training, experience and participation in this
investigation, including my participation in the post-arrest
interview of ARBABSIAR, I understand that the "colonel" that
ARBABSIAR referred to is GHOLAM SHAKURI, a/k/a "Ali Gholam
Shakuri," the defendant, and that ARBABSIAR was stating that
after he received expense money from his cousin, he received an
additional expense payment from SHAKURI, see infra n.13.

       e.   At the end of the July 17 meeting, ARBABSIAR

---

  [8]  On numerous occasions during the July 17 meeting,
ARBABSIAR made it clear that the assassination needed to go
forward, even if doing so would cause mass casualties.  For
example, ARBABSIAR said: "They want that guy [the Ambassador]
done [killed], if the hundred go with him, fuck 'em."  In a
similar vein, ARBABSIAR and CS-1 also discussed the means by
which the Ambassador would be killed.  CS-1 said: "I'm gonna blow
him [the Ambassador] up or shoot him, whatever you want."
ARBABSIAR responded: "Yeah, it doesn't matter . . . [w]hatever is
easy for . . . how is possible for you."

declared "[l]et it hit the restaurant.   If, if you can do it
outside, do it.   If not, restaurant, hit it, it's ok," by which I
understand ARBABSIAR to mean that if CS-1 could not assassinate
the Ambassador outside the restaurant, he should "hit" or bomb
the restaurant.   In response, CS-1 then noted that there were
"from a hundred, a hundred and fifty [people in the restaurant]"
and "buildings on the sides," and "senators [U.S. Senators who
dine there]," all of which ARBABSIAR dismissed as "no problem" or
"no big deal," meaning that the potential for such casualties
should not dissuade CS-1 from killing the Ambassador.

   C.   **JULY AND AUGUST 2011:**
        **PAYMENTS ARE MADE TO CS-1**

        24.   According to travel records, MANSSOR ARBABSIAR,
a/k/a "Mansour Arbabsiar," the defendant, traveled from Mexico,
departing for a foreign country, on or about July 20, 2011.[9]

        25.   As noted above, see supra ¶ 23, at the July 17
meeting, CS-1 provided MANSSOR ARBABSIAR, a/k/a "Mansour
Arbabsiar," the defendant, with a bank account and routing
number, so that payment could be made for the assassination of
the Ambassador.   The account information CS-1 provided was in
fact associated with the UC Bank Account.

        26.   On or about August 1, 2011, an overseas wire
transfer of approximately $49,960 was sent by a foreign entity
("Foreign Entity-1") from a bank located in a foreign country
(the "Foreign Bank") through a bank in Manhattan to the UC Bank
Account.

        27.   On or about August 6, 2011, MANSSOR ARBABSIAR,
a/k/a "Mansour Arbabsiar," the defendant, spoke with CS-1 on the
telephone.   CS-1 recorded the conversation.   Based on my review
of draft transcripts of the recorded conversation, I know that
during the call, CS-1 asked ARBABSIAR whether he (ARBABSIAR) had
"already finished the other half of . . . the money."   ARBABSIAR
replied, "I sent it yesterday."   I understand that ARBABSIAR was
acknowledging that the previous day he sent to CS-1 the second
half of the approximately $100,000 down-payment, see supra ¶
22(b), for the murder of the Ambassador.   I understand that "the
other half" of the $100,000 was received on or about August 9,

_____

        [9]   Three days prior to ARBABSIAR's July 20 flight, during
the July 17 meeting with CS-1, see supra, ARBABSIAR indicated to
CS-1 that ARBABSIAR would be traveling to Iran on July 20 to see
his cousin.

2011, see infra ¶ 28, and that the first "half" was received on or about August 1, 2011, see supra ¶ 26.

28.   On or about August 9, 2011, an overseas wire transfer of approximately $49,960 was sent by another foreign entity ("Foreign Entity-2") from the Foreign Bank through a bank in Manhattan to the UC Bank Account.

29.   On or about August 11, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, spoke with CS-1 on the telephone.  CS-1 recorded the conversation.  Based on my review of draft transcripts of the recorded conversation, I know that during the call, ARBABSIAR asked CS-1, "Did you check the bank?" CS-1 responded in the affirmative, "I check in the bank, everything is there."  I understand that ARBABSIAR was confirming that CS-1 received the $49,960 that arrived in the UC Bank Account on or about August 9, 2011, see supra ¶ 28.

D.   **SEPTEMBER 2011:**
     **ARBABSIAR RETURNS TO MEXICO**

30.   On or about September 2, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, spoke with CS-1 on the telephone.  CS-1 recorded the conversation.  Based on my review of draft transcripts of the recorded conversation, I know that during the call, ARBABSIAR asked CS-1 if the "building is getting painted" and CS-1 responded "we're still doing that."  I understand that by asking that question, ARBABSIAR was asking CS-1 whether the arrangements to kill the Ambassador were still underway.[10]  ARBABSIAR then stated, "once we do this one, you gonna open a [U/I] like, uh . . . you got the number for the safe" and "[o]nce you open the door, that's it.  You know what I mean? . . . [y]ou don't have to worry about anything."  I understand that ARBABSIAR was explaining to CS-1 that after CS-1 and his team assassinated the Ambassador, CS-1 would make money from that and other projects with ARBABSIAR and his associates, see supra n.6.

31.   On or about September 12, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, spoke with CS-1 on the

_____

[10]   Based on my training and in my experience, individuals who speak explicitly about criminal activity during in-person meetings, see, e.g., supra ¶¶ 22, 23, often speak in coded language during telephone conversations, in an effort to conceal the subject matter of their discussions in the event that they are overheard or intercepted.

telephone.  CS-1 recorded the telephone conversation.  Based on
my review of a draft transcript of the recording, I learned that
ARBABSIAR told CS-1 that "the number is gonna stay the same thing
. . . [o]ne and a half . . ."  I understand ARBABSIAR was stating
that CS-1 would receive the same amount of money ("[o]ne and a
half": $1.5 million) for the assassination that ARBABSIAR and CS-
1 had previously discussed.  See supra ¶ 22(a).  ARBABSIAR also
referred to "the number we did" and told CS-1 that he could
"prepare for those too . . . but we need to at least one of
them."  I understand ARBABSIAR to have been informing CS-1 that
in the future CS-1 could prepare for the additional attacks
previously mentioned, see supra n.6, but that CS-1 first needed
to assassinate the Ambassador.  ARBABSIAR promised CS-1 that if
he does "at least one . . . I'll send the balance for you," which
I understand to mean that CS-1 would receive the remainder of his
$1.5 million payment after the Ambassador has been assassinated.
ARBABSIAR also stated, "[t]he first one they just want it . . .
for test," which I understand to mean that CS-1's first task was
designed as a test run, with future assignments to follow if the
assassination was successful.

        32.  On or about September 20, 2011, MANSSOR ARBABSIAR,
a/k/a "Mansour Arbabsiar," the defendant, spoke with CS-1 on the
telephone.  CS-1 recorded the telephone conversation.  Based on
my review of a draft transcript of the recording, I learned that
CS-1 told ARBABSIAR, "I'm ready for the . . . for the thing, for
the house, man, to be painted but . . . I need to, I need, either
I need you or I need half of the . . . of the check that we're
gonna receive to . . . so I can go ahead and . . . be finished
with the job."  I understand CS-1 to have been requesting that
ARBABSIAR either pay one-half of the agreed upon price ($1.5
million, see supra ¶ 22(a)) for the murder of the Ambassador or
go personally to Mexico to serve himself as collateral for the
final payment of the fee for the assassination.[11]  Based on my
training and experience, I know that this form of personal
guarantee is common for large scale illicit transactions.
Ultimately, based on my review of the transcript of the September
20, 2011 call, I believe that ARBABSIAR agreed to travel to
Mexico per CS-1's request to guarantee payment for the murder of
the Ambassador ("I'm gonna go over there [in] two [or] three
days, I'll go over there. . . . Don't wait for me.  Get ready,
but I'll be over there.").  Later during the night of September
20, CS-1 returned a call from ARBABSIAR.  At the direction of
law-enforcement agents, CS-1 recorded the telephone conversation.

_____

        [11]  CS-1 initially requested that ARBABSIAR send someone to
Mexico as collateral in a recorded call between CS-1 and
ARBABSIAR on or about August 28, 2011.

-14-

During the call, ARBABSIAR inquired as to "how long [he] need[s] to stay in Mexico." I understand ARBABSIAR to have been asking how long he would have to stay in Mexico to supply a sufficient guarantee for payment to CS-1 and CS-1's associates following completion of the plot to murder the Ambassador.

E.   **THE ARREST AND SEARCH**

33.   On or about September 28, 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, flew to Mexico. ARBABSIAR was denied entry into Mexico, and then flew on to John F. Kennedy International Airport ("JFK"), in New York City. During the flight, law-enforcement officials aboard conducted surveillance of the defendant without alerting him to their presence. After ARBABSIAR exited the plane at JFK, law-enforcement agents arrested ARBABSIAR.

34.   After he was placed under arrest, law-enforcement agents recovered numerous items from MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, and from his luggage. (The luggage was searched pursuant to a warrant issued by a United States Magistrate Judge.) These items included, among other things: approximately $3,900 in United States currency, composed of one-hundred dollar bills; a sum of Iranian currency; an Iranian passport; a United States passport; and a travel itinerary reflecting a flight departing Mexico during October of 2011, with an ultimate destination of Tehran, Iran.

IV.   **ARBABSIAR'S CONFESSION**

35.   Several hours after his arrest, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, was advised of his <u>Miranda</u> rights and his right to a speedy presentment. ARBABSIAR agreed to waive those rights and to speak with law-enforcement agents. As set forth more fully below in the paragraphs that follow, during a series of <u>Mirandized</u> interviews, ARBABSIAR confessed to his participation in the plot described above.[12] In particular, and as described more fully below, ARBABSIAR admitted that he had arranged for CS-1 to murder the Ambassador; that he

---

[12]   The interviews were conducted principally in English. Occasionally, ARBABSIAR spoke in Farsi. One of the law-enforcement agents who conducted the interviews is fluent in Farsi. A small portion of the substance of ARBABSIAR's oral statement is described in the instant Complaint. In addition to providing an oral statement, the defendant signed a typewritten statement admitting to the conduct that forms the basis for the charges herein.

(ARBABSIAR) had discussed with CS-1 the means by which CS-1 and his criminal associates would commit the murder; and that he (ARBABSIAR) made a down-payment to CS-1 for the murder by causing a total of $100,000 to be deposited in the UC Bank Account. Furthermore, ARBABSIAR admitted that in connection with this plot, he (ARBABSIAR) was recruited, funded, and directed by men he understood to be senior officials in the Qods Force, see supra ¶ 17.  ARBABSIAR further explained that men he understood to be senior Qods Force officials were aware of and approved, among other things, the use of CS-1 in connection with the plot; payments to CS-1; and the means by which the Ambassador would be killed in the United States and the casualties that would likely result.

36.  MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, explained that his cousin, see supra, approached ARBABSIAR in the early spring of 2011, while ARBABSIAR was in Iran, and asked ARBABSIAR to work with him (ARBABSIAR's cousin). ARBABSIAR had long understood that his cousin (hereinafter "Iranian Official #1"), was a high-ranking member of the Qods Force.  ARBABSIAR told Iranian Official #1 that as a result of his business in both Mexico and the United States, he (ARBABSIAR) knew a number of people who traveled between the two countries, and some of those people, he (ARBABSIAR) believed, were narcotics traffickers.  Iranian Official #1 told ARBABSIAR that he wanted ARBABSIAR to hire someone who could kidnap the Saudi Arabian Ambassador to the United States and that ARBABSIAR should find someone in the narcotics business, because people in that business are willing to undertake criminal activity in exchange for money.

37.  MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, further acknowledged that Iranian Official #1 subsequently provided ARBABSIAR with thousands of dollars for expenses.[13]  ARBABSIAR thereafter traveled to Mexico, where he met CS-1.[14]

---

[13]  In the course of his discussions with Iranian Official #1, Iranian Official #1 indicated that another individual, GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, worked for him (that is, for Iranian Official #1) as his (Iranian Official #1's) deputy.  After Iranian Official #1 provided ARBABSIAR with thousands of dollars for expenses, SHAKURI separately provided ARBABSIAR with thousands of dollars for expenses.

[14]  During the course of his interviews, ARBABSIAR explained how he came to meet CS-1.

38.   MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, admitted that, while he was in Mexico, he (ARBABSIAR) and CS-1 discussed, among other things, a plan to kill the Ambassador by bombing a restaurant the Ambassador frequented, for which CS-1 said he would charge $1.5 million.   ARBABSIAR then returned to Iran from Mexico.

39.   MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, stated that upon his return to Iran, he (ARBABSIAR) met together on a number of occasions in Tehran with GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, and a third individual, who ARBABSIAR understood was a high-ranking member of the Qods Force (hereinafter "Iranian Official #2").[15]   ARBABSIAR stated he also met routinely on a one-on-one basis with SHAKURI. During these meetings, the following occurred, among other things:

a.   ARBABSIAR indicated that he (ARBABSIAR) had located a drug dealer in Mexico (referring to CS-1).   ARBABSIAR was asked to have CS-1 kidnap or kill the Ambassador of Saudi Arabia to the United States, and told that it would need to be done fast.   ARBABSIAR was also asked whether CS-1 would travel internationally, so that CS-1 could speak face-to-face with other operatives.   ARBABSIAR indicated that CS-1 would not do so.

b.   ARBABSIAR stated that the plan was to blow up a restaurant in the United States frequented by the Ambassador and that in light of that plan numerous people, in addition to the Ambassador, could be killed.   This plan was approved.

c.   ARBABSIAR was instructed to use code words when communicating with SHAKURI.   For example, ARBABSIAR was instructed to use the code word "Chevrolet" for the Ambassador plot.

d.   A down-payment of $100,000 to CS-1 for the

---

[15]   ARBABSIAR has been shown an array of seven photographs. Amongst these seven photographs were one photograph of each of two men known to the United States to be senior members of the Qods Force.   It is believed that these two photographs are not publicly available.   ARBABSIAR identified one of these photographs as depicting Iranian Official #2.   The person depicted in the photograph that ARBABSIAR identified is known to the United States to have used the alias by which ARBABSIAR knew Iranian Official #2.

murder of the Ambassador was approved.[16]

        e.  SHAKURI advised ARBABSIAR that an individual whom ARBABSIAR understood to be the leader of the Qods Force (hereinafter "Iranian Official #3"), was aware of what ARBABSIAR was doing and that he (ARBABSIAR) could meet with Iranian Official #3 in the future.

        40.  In or about late September 2011, MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, met with GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, in Tehran.  ARBABSIAR explained that CS-1 wanted either to receive half of the money previously promised for the completion of the murder, or to have ARBABSIAR travel back to Mexico as a guarantee of payment, see supra ¶ 32.  SHAKURI stated that no more money would be given to CS-1, and advised ARBABSIAR against traveling back to Mexico.  SHAKURI said that ARBABSIAR was responsible for himself if he did travel.  SHAKURI then told ARBABSIAR to get in contact with him (SHAKURI) via telephone after ARBABSIAR'S arrival in Mexico so that he (SHAKURI) could be sure ARBABSIAR was well.

## V.  OCTOBER 2011: RECORDED TELEPHONE CALLS BETWEEN SHAKURI AND ARBABSIAR

        41.  Following the arrest of MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, ARBABSIAR agreed to place a recorded call to GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant.  On October 4, 2011, at the direction of federal law enforcement agents, ARBABSIAR placed a call to an Iranian telephone number ("Iranian Phone Number").  Agents monitored and recorded the call.[17]  Following the call, ARBABSIAR indicated that the person he was speaking with was SHAKURI.  Based on my review of the draft translation of that recording I know that SHAKURI asked, "[a]re you ok, . . . are you well?" to which ARBABSIAR responded, "Yes, I wanted to see how you're doing and to tell you I am well."  SHAKURI responded, "Okay, thank God, stay well."  SHAKURI then added, "I was waiting," and asked,

---

    [16]  Subsequently, Individual #1 told ARBABSIAR that he (Individual #1) had received a delivery of money from SHAKURI. ARBABSIAR then arranged for this money to be sent from Tehran to the United States.

    [17]  On this call and the calls referenced in paragraphs 42 and 43, ARBABSIAR and SHAKURI spoke in Farsi.  I have reviewed draft translations of these three calls.

"what news . . . what did you do about the building?" Based on my
training, experience and participation in this investigation, I
understand the question about "the building" to be a reference to
the plot to murder the Ambassador and a question about its
status.  Cf. supra ¶ 30.

     42.  On October 5, 2011, MANSSOR ARBABSIAR, a/k/a
"Mansour Arbabsiar," the defendant, placed another monitored and
recorded call to the Iranian Phone Number.  Following the call,
ARBABSIAR indicated that the person he was speaking with was
GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant.  Based
on my review of a draft translation of the recorded conversation,
I know that during the call, the following occurred, among other
things:

          a.   ARBABSIAR stated, "I wanted to tell you, the
Chevrolet is ready, it's ready, uh, to be done.  I should
continue, right?"  See supra ¶ 39(c) (noting that "Chevrolet" was
the agreed-upon code for the plot to murder the Ambassador).
SHAKURI responded, "Yes. Yes, yes."  SHAKURI later asked, "You
mean you are buying all of it?"  ARBABSIAR responded, "I don't
know for now, it's ready, okay?"  SHAKURI replied, "So buy it,
buy it."  ARBABSIAR confirmed, "Buy it?  Okay."  SHAKURI then
stated, "Buy it, yes, buy all of it."  Based on my training,
experience and participation in this investigation, I understand
that SHAKURI confirmed by these statements that ARBABSIAR should
move forward with the plot to murder the Ambassador.

          b.   ARBABSIAR then stated that "this boy wants,
uh, some money, he wants some expenditure.  What do you say,
should we give him some more?  He wants another 50," and SHAKURI
responded, "With you, no, you . . . that amount is fine, [UI]
brought me another car.  Tell him to finish his work, then we'll
give him the rest.  He should buy the car for us first."  Based
on my training, experience and participation in this
investigation, I understand that on this call, SHAKURI was
insisting that CS-1 should not receive any additional money until
he had killed the Ambassador.

          c.   Thereafter, SHAKURI urged ARBABSIAR "[j]ust
do it quickly, it's late, just buy it for me and bring it
already."  I understand that SHAKURI is urging ARBABSIAR to
accomplish the agreed upon task - the murder of the Ambassador -
as quickly as possible.

     43.  On October 7, 2011, MANSSOR ARBABSIAR, a/k/a
"Mansour Arbabsiar," the defendant, placed another monitored and
recorded call to the Iranian Phone Number.  Following the call,
ARBABSIAR indicated that the person he was speaking with was

GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant.  Based
on my review of a draft translation of the recorded conversation,
I know that during the call, the following occurred, among other
things:

        a.   ARBABSIAR stated, ". . . this Mexican,
. . . keeps on insisting on the thing.  He says, 'If - I need
money, 50.  I won't do the job if you don't pay.'  And
everything's ready."  SHAKURI responded, "Okay."  ARBABSIAR
asked, "What do you say now?"  SHAKURI replied, "I don't know.
You guaranteed this yourself . . . of course, if we give it,
we'll give it to you.  Okay?  If he gives it, fine; if not we
must provide the 100 [or] 50.  Tell him, [U/I]."  ARBABSIAR then
stated, "Well, yeah.  Now, I – what do you say?  What should I
do? [U/I]" SHAKURI responded, "How much is he talking about?"
ARBABSIAR said, "I don't know.  He's saying, for instance, well
how – he says well – so, I thought, so that the 100 we gave won't
go to waste; that's why.  On the other hand, we gave a 100 and
that would go to waste as well."  See supra ¶¶ 26-28 (noting that
CS-1 was paid $100,000 as a down-payment for killing the
Ambassador).  SHAKURI replied, "Well, yeah, but what if you give
this one it goes to waste as well?"  Based on my participation in
this investigation, I understand that SHAKURI was questioning
whether additional payments should be made to CS-1 ("this
Mexican"), in light of the fact that CS-1 had not yet killed the
Ambassador, and had already been paid $100,000 ("100").

        b.   Shortly thereafter ARBABSIAR stated,
referring to CS-1, "That's what the Mexican . . . wants . . .
What can I do?" and SHAKURI responded, "Okay, today I'll discuss
it to see what they say."  Based on my experience and
participation in this investigation, I understand that SHAKURI is
explaining that he would consult with his superiors regarding
whether they would be willing to pay CS-1 additional money.

        c.   Thereafter, SHAKURI stated, "You said that
for sure they're saying that much.  We didn't discuss it though,
we - in any case, he needs to deliver it to us, okay?" to which
ARBABSIAR responded, "Completely.  Yeah, yeah, I know what you're
saying."  SHAKURI then said: "You guaranteed it" and ARBABSIAR
responded, "Well, I guaranteed it, but they . . . they're not
ordinary people . . . they're not law abiding . . . people."  See
supra ¶¶ 32, 33 (CS-1 asked ARBABSIAR to travel personally to
Mexico as a guarantee that CS-1 would be paid in full upon the
killing of the Ambassador; ARBABSIAR thereafter traveled to
Mexico).  Based on my training, experience and participation in
this investigation, I understand that SHAKURI was reminding
ARBABSIAR that he (ARBABSIAR) traveled to Mexico to serve as a
personal guarantee of full payment to CS-1 upon the killing of

-20-

the Ambassador.

    d. SHAKURI then stated: "You said it yourself, they – from our point of view of – when we get our merchandise, we get our merchandise."  SHAKURI added, "We have guaranteed the rest.  You were our guarantee."  Based on my training, experience and participation in this investigation, I understand that SHAKURI was stating that "we", meaning himself and others involved in the plot, had "guaranteed" full payment to CS-1 for the killing of the Ambassador by ARBABSIAR's presence in Mexico ("You were our guarantee").  See supra ¶¶ 32, 33.

    WHEREFORE, deponent respectfully requests that MANSSOR ARBABSIAR, a/k/a "Mansour Arbabsiar," the defendant, be imprisoned, or bailed, as the case may be, and that a warrant issue for the arrest of GHOLAM SHAKURI, a/k/a "Ali Gholam Shakuri," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

O. Robert Woloszyn
Special Agent
Federal Bureau of Investigation

Sworn to before me this
11th day of October, 2011

HONORABLE MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK